**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

v.                                            Case No.

PUBLIC SERVICE COMPANY OF NEW MEXICO,
and
PNMR SERVICES COMPANY,

     Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

**<u>NATURE OF THE ACTION</u>**

     This is an action under Title I and Title V of the Americans with Disabilities Act of 1990 as amended by the ADA Amendments Act of 2008 ("ADA") and Title I of the Civil Rights Act of 1991 against Defendants Public Service Company of New Mexico and PNMR Services Company (collectively "PNM") to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Myron Charley, Erika Davis, Fredrick Kloeppel, Daniel Lopez and other aggrieved individuals, who were adversely affected by such practices. As stated with greater particularity below, the Equal Employment Opportunity Commission ("EEOC") alleges that PNM engaged in unlawful conduct when it failed to accommodate qualified employees with disabilities and discharged them because of their disabilities or because of the need to provide reasonable accommodation for their disabilities. The EEOC also alleges that PNM

retaliated against individuals with disabilities for engaging in protected conduct, including requesting accommodations, in violation of the ADA.

Further, the EEOC alleges that PNM implemented and acted on the following policies and practices that had the effect of denying employees reasonable accommodations for disabilities: 1) the practice of not allowing employees to return from medical leave unless they are released to return to "full duty" or "without medical restrictions," ("Full Duty Practice"); 2) within its leave policies, without considering possible reasonable accommodations, PNM placed employees, who were unable to return to work without restrictions within 90 days, into unpaid leave status and removed them from their current jobs ("Inflexible Leave Policy"); and 3) as a matter of policy, PNM refused to abide by the ADA's affirmative mandate for employers to reassign employees with disabilities to vacant positions they were qualified for as a possible reasonable accommodation ("No Reassignment Policy").

Last, the EEOC alleges PNM's Full Duty Practice is a discriminatory qualification standard that violates Sections 102(b)(3) and 102(b)(6) of the ADA and 42 U.S.C. §12112(b)(3) and (b)(6) and adversely impacted its employees with disabilities.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference 42 U.S.C. Section 706(f)(1), (3), 42 U.S.C. §2000e-5(f)(1), (3), and pursuant to Sections 102 and 503 of the Civil Rights Act of 1991, 42

U.S.C. §1981a and 42 U.S.C. § 12203(c).

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of New Mexico.

## PARTIES

3.      Plaintiff, the Equal Employment Opportunity Commission, is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title I of the ADA and is expressly authorized to bring this action by Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1),(3), 42 U.S.C. § 2000e-5(f)(1),(3).

4.      At all relevant times, Defendants Public Service Company of New Mexico and PNMR Services Company, each a New Mexico corporation, have continuously been and are now doing business in the State of New Mexico and jointly Defendants have continuously had more than 500 employees.

5.      At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C.§ 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7), which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(a), (g) and (h).

6.      At all relevant times, each of the Defendants have been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## GENERAL ALLEGATIONS

### Conditions Precedent

7.    More than thirty days prior to the institution of this lawsuit, Myron Charley, Erika Davis, Frederick Kloeppel and Daniel Lopez filed charges of discrimination with the EEOC alleging violations of the ADA by PNM.

8.    The EEOC provided PNM with notice of the charges of discrimination.

9.    The EEOC investigated the charges of discrimination.

10.    The EEOC issued letters of determination finding reasonable cause to believe that PNM engaged in certain unlawful employment practices identified in the determinations.

11.    The EEOC's determinations included an invitation for PNM to join the Commission in informal methods of conciliation in an attempt to eliminate the alleged unlawful employment practices.

12.    The EEOC and PNM were unable to reach an agreement satisfactory to the EEOC through the conciliation process.

13.    On or about June 21, 2021, the EEOC sent notice to the PNM that conciliation efforts had failed.

14.    The EEOC fulfilled all conditions precedent to the institution of this lawsuit.

### Public Service Company of New Mexico and PNMR Services Company are an Integrated Enterprise Under Title VII.

15.    Since at least January 2015, PNM engaged in unlawful employment practices in violation of § 102 of Title I and Title V of the ADA, 42 U.S.C. § 12112(a)

(b)(3) (b)(5) and ((b)(6), and § 503 of Title V of the ADA, 42 U.S.C. § 12203.

16.    Defendants Public Service Company of New Mexico ("Public Service Company") and PNMR Services Company ("PNMR"), are both New Mexico corporations.

17.    PNM operates its businesses as an integrated enterprise or joint employer for purposes of the ADA, based on the facts below:

a.    According to the New Mexico Secretary of State's records, the five corporate officers of Defendant Public Service Company hold many similar corporate officer positions as Defendant PNMR;

b.    Both corporations are run from the same corporate headquarters at the same address at 414 Silver Avenue, SW in Albuquerque, New Mexico;

c.    Employees of both corporations are in a single collective bargaining unit represented by International Brotherhood of Electrical Workers Local Union #611 ("IBEW #611");

d.    IBEW #611 has a single collective bargaining agreement ("CBA") covering the employees in New Mexico of both Defendants;

e.    Both corporations use the same labor relations staff regarding matters relating to the CBA with IBEW #611, and other labor relations matters;

f.    Both corporations use the same employment policies and procedures;

g.    Both corporations use the same human resource management personnel for implementing the employment policies and procedures;

h.  Both corporations use the same legal personnel for implementing the employment policies and procedures;

i.  Upon information and belief, both corporations jointly operate the various PNM facilities throughout the state;

j.  All operations and facilities owned or operated by PNM in New Mexico are managed and run through PNM's centralized office in Albuquerque, New Mexico;

k.  Supervisors and managers for both Defendants, are instructed to direct personnel-related inquiries to the same legal and human resource personnel at PNM's joint headquarters in Albuquerque, New Mexico.

l.  Supervisors and managers for both Defendants, are instructed to direct any labor-related inquiries and grievances under the CBA to the same legal and labor relations personnel at PNM's joint headquarters in Albuquerque, New Mexico.

**PNM's Policies and Practices Violate the ADA.**

18.  At all relevant times, PNM instituted and/or maintained a policies and practices which instructed employees on taking leave for medical reasons.

**PNM's Full Duty Practices by Prevented
Employees with Disabilities from Returning to Work.**

19.  PNM Supervisors at facilities across New Mexico often instructed employees going on medical leave that they could not return to work unless they could come back "100%," "full duty," or "without restrictions."

20.     A full duty medical release was a release authorizing the employee to return to work without any medical restrictions.

21.     Under the Full Duty Practice, PNM did not allow employees who were able to perform their essential job functions with reasonable accommodations to work if the employees' medical release listed any restrictions.

22.     PNM did not engage with the employee in an interactive process to determine whether there was an accommodation that would enable the employee to perform the essential functions of their job.

23.     Instead of the individualized assessment of whether the employee could perform their essential job functions, with or without reasonable accommodation, PNM required employees to have no medical restrictions.

**PNM's Inflexible Leave Policy Prematurely Removed Employees with Disabilities from their Current Jobs without Considering other Accommodations.**

24.     Under PNM's Inflexible Leave Policy (policy #128), PNM posts and fills an employee's job if that employee is not able to return to work at their current position within 90 calendar days.

25.     As a matter of policy and practice, PNM's human resources department routinely sent form letters to employees warning employees on medical leave that they would be placed on unpaid leave status on their 91st calendar day of absence, lose their right to continue at their current job and that they would need to apply for a new position within the company if they wanted to remain employed with PNM.

26.     After the 90th day of an employee's medical absence, PNM's process in implementing its leave policy was to:

a. remove the employee from PNM's payroll and place the employee in unpaid leave status;

b. open that employee's position for hiring a replacement; and

c. inform the employee they had 120 days from the date they have a medical release, with or without restrictions, to find another job at PNM or be discharged;

27.    Once the employee was placed into unpaid leave status, neither PNM's human resource personnel or the employee's immediate supervisors continued with the interactive process to determine whether the employee's restrictions could be accommodated, and the employee returned to work.

28.    As part of its Inflexible Leave Policy, PNM told employees with disabilities who were placed in unpaid leave status that they may not be allowed to return to work in their own jobs, even if they were able to perform all essential job functions, with or without reasonable accommodation.

29.    Before placing an employee with a disability in unpaid leave status, PNM did not consider or communicate with the employee as to whether any reasonable accommodations might be available for the employee to continue working or return to work.

30.    Employees who sought reassignment to other positions were told they could, on their own, search for and find available positions they felt qualified to hold, apply for such positions, and compete with other internal and external applicants for the job.

31.    Under PNM's policy, employees in unpaid leave status were allowed 120 days after being released to return to work, with or without restrictions, to find another job at PNM.

32.    Employees with disabilities who were no longer able to perform their own jobs, or not allowed to return to their own jobs under PNM's Full-Duty Practice, were rarely, if ever, successful in obtaining other jobs using PNM's do-it-yourself process for finding an alternate position.

33.    PNM did not reassign any employee who was no longer able to perform their own job as a result of a disability.

34.    PNM did not reassign any employee who was not allowed to return to their own job because they did not have a "full-duty" release to work without medical restrictions.

35.    As a matter of policy and practice, PNM discharged employees for "failure to return to work," if they were unable to find another PNM job within 120 days after being released to return to work, with or without medical restrictions.

36.    During the 120 days of unpaid leave for employees who were unable or not allowed to return to their own jobs because of a disability, PNM did not engage with the employees in an interactive process to explore and consider potential reasonable accommodations, including reassignment.

37.    Prior to discharging employees after 120 days of unpaid leave, PNM did not engage with the employees in an interactive process to explore and consider potential reasonable accommodations, including reassignment.

**Charging Party Erika Davis**

38.    Charging Party Erika Davis ("Davis") worked at many positions at PNM, her last position being an Accountant II for PNM.

39.    Davis suffered closed-head injuries in a non-work-related accident on October 11, 2015.

40.    Davis's physical injuries affected her neurological system causing eye strain and headaches, and they substantially limited her in several major life activities including, without limitation, seeing, concentrating, thinking, and neurological function.

41.     Once Davis provided PNM notice of her injuries, PNM placed her on FMLA leave and then intermittent FMLA leave, consisting of 2 hours telework at home and 6 hours of leave per day, in accordance with her physician's restrictions.

42.    In January 2016, Davis's supervisor told PNM's HR staff that he thought Davis was faking and did not need accommodation of partial workdays and telework.

43.    In March 2016, when Davis' intermittent FMLA leave expired, PNM continued to provide the accommodation of partial workdays and telework.

44.    In March 2016, when Davis's intermittent FMLA leave expired, her supervisor placed her on a performance improvement plan for not accomplishing all of her goals while on FMLA leave.

45.    The supervisor told Davis he expected her to perform 100% of the essential functions of her position and meet all goals during the time she was on intermittent FMLA leave and/or working partial days.

46.    In May 2016, in a telephone call with Davis' supervisor and an HR

manager, PNM told her that it was withdrawing the accommodations of partial days and telework effective June 8, 2016. PNM further required Davis her to return to full duty work at the office no later than June 13, 2016.

47.    Davis explained during the May 2016 call that she had a doctor's appointment on June 8, 2016 and would provide PNM with her physician's recommendation regarding her return to work.

48.    During the May 2016 phone call, PNM did not discuss any alternative accommodations with Davis.

49.    During the May 2016 phone call, PNM made clear to Davis she must return to work at the office by June 13, 2016.

50.    On June 9, 2016, Davis provided PNM a copy of her doctor's release with restrictions, and she proposed a revised accommodation consistent with her doctor's restrictions where she would return to full-time hours (8 hours per day), partially in the office and partially telework, but gradually increasing her in-office hours each week.

51.    Davis proposed the gradual increase of in-office work occur over a period of one month and proposed returning to full duty at the office without any restrictions by July 25, 2016.

52.    The accommodation proposed by Davis on June 9, 2016 – graduated return to full in-office workdays by July 25, 2016 – would not have imposed an undue hardship on the operation of PNM's business.

53.    PNM denied her accommodation request without any explanation and without proposing any alternative accommodations.

54.    PNM also informed Davis that if she was not able to return to full-time work at the office by June 13, 2016, regardless of any restrictions, she would be placed in unpaid leave status.

55.    On June 9, 2016, Davis emailed PNM and explained that due to her doctor's current restrictions, she could not return to full duty work in the office on June 13th, as PNM was demanding.

56.    On June 13, 2016, PNM placed Davis in unpaid leave status.

57.    On June 13, 2016, PNM HR sent Davis the following email:

> "Hi Erika. Once you receive a full release from your physician, and if your job is no longer available, you will have four months to look for another position in the company. During this time, you will still be considered an employee. If you are unable to find a job within this timeframe, your employment with the company will end."

58.    During the period between March 2016 and June 13, 2016, PNM did not engage with Davis in an interactive process to discuss what job functions were essential that she was unable to perform because of her disability or limitations, or any potential accommodations that might enable her to perform the essential functions of her accounting position at PNM.

59.    When PNM determined Davis was unable to perform the essential functions of her own job and placed her in unpaid leave status, PNM did not consider reassignment as a reasonable accommodation and it did not look for other vacant positions that Davis was qualified for and could have been reassigned to, with or without reasonable accommodations.

60.    While Davis was in unpaid leave status, PNM did not engage with Davis in

any interactive process to identify the precise limitations resulting from her disability and potential accommodations that could overcome those limitations, including but not limited to reassignment to any vacant positions at the company.

61.    PNM discharged Davis in October 2016, after she had been in unpaid leave status for 120 days.

**Charging Party Myron Charley**

62.    From 2008 to 2016, Charging Party Myron Charley ("Charley") worked at PNM's San Juan Generating Station ("SJGS") in several different positions.

63.    During 2013 and 2014, Charley injured and reinjured his left ankle at work.

64.    In February 2014, Charley's injury required a screw to be implanted in his left ankle.

65.    The injury, surgeries, and related problems affected Charley's musculoskeletal system such that it substantially limited several major life activities including, without limitation, walking, standing, and musculoskeletal function.

66.    In June 2015, Charley was released to return to work with restrictions that required an ankle brace, work only 8 hours per day – no overtime, stand no more than 30 minutes per hour, alternate sitting and standing, walk only short distances, and no using stairs (only the elevator).

67.    After Charley was released in June 2015, PNM did not let him return to work because PNM indicated it was unable to accommodate his restrictions without providing any explanation.

68.     Also in September, Charley asked PNM to reassign him to one of the reserved vacant light duty positions in the warehouse and asked again a few weeks later if any openings were expected in the warehouse.

69.     PNM refused Charley's requests to be reassigned to the warehouse.

70.     After seeing his doctor on November 13, 2015, Charley again asked PNM about being reassigned to reserved vacant light duty positions or other open positions at the facility.

71.     During the period PNM did not allow Charley to work in 2015, PNM allowed reserved vacant light duty assignments at the San Juan facility for at least four other employees.

72.     Charley was qualified and able to perform the light duty work the other employees were assigned at the San Juan Facility in 2015.

73.     On January 6, 2016, Charley was released to return to work, limited to 8 hours per day, with no overtime until after his next appointment later in the month.

74.     PNM did not allow Charley to return to work until he was released without restrictions.

75.     On January 29, 2016, Charley was released to work full duty, without restrictions.

76.     After working a couple of days, Charley called in absent to his shift supervisor because of pain in his left foot from the previous surgery.

77.     During the call, Charley's shift supervisor told him he could not keep taking days off because of his foot and he ought to quit if can't come to work. Charley

replied to his shift supervisor that he was not quitting.

78.    Charley received a telephone call from the Plant Manager, Heath Lee, the next day.

79.    During the telephone call, Lee told Charley that they couldn't keep going around and around like this, and that Charley could not keep calling in absent every time his foot was sore since he had a full medical release.

80.    Lee then told Charley to come in and resign, or be fired, saying he will prepare papers for Charley to sign in his office.

81.    Under PNM's threat of discharge, Charley resigned the next day, February 2, 2016.

82.    During these communications in February 2016, Charley was a qualified employee with a disability due to his continuing recovery from his ankle and foot surgery. No PNM manager, supervisor, or human resource official ever engaged with Charley in an interactive process to discuss potential accommodations, including additional intermittent leave or reassignment to a different position that would enable Charley to remain employed with PNM.

**Charging Party Frederick Kloeppel.**

83.    Frederick ("Rick") Kloeppel is a Journeyman Lineman with PNM.

84.    On July 21, 2017, Kloeppel tore tendons in his left foot while he was at work. The injury affected his musculoskeletal system and substantially limited several major life activities including, without limitation, walking, climbing, lifting, and musculoskeletal function.

85.    At all relevant times to this lawsuit, Kloeppel was a qualified individual with a disability as defined by the ADA.

86.    From July to November 2017, Kloeppel was assigned to reserved light duty work that he was able to do with his medical restrictions that limited lifting any heavy objects.

87.    In November 2017, Kloeppel underwent surgery on his foot and was off work for six weeks recovering from surgery.

88.    In December 2017, Kloeppel returned to the same light duty assignment he was doing before his surgery which included restrictions on heavy lifting.

89.    In December 2017, Kloeppel was reassigned to work on a light duty crew with co-worker Danny Lopez ("Lopez") who also had a disability.

90.    Kloeppel and Lopez worked for several months at their reassigned light duty positions, reserved for those with work-related injuries, performing the duties of Line Patrol and Inspector.

91.    During the months Kloeppel and Lopez performed Line Patrol and Inspector duties, there was no criticism of their work and no disciplinary action indicating they were not satisfactorily performing their job duties.

92.    On March 3, 2018, PNM's crew supervisor ordered Kloeppel and Lopez to lift and pull open some heavy metal grates.

93.    Kloeppel and Lopez both protested that the assigned task required lifting more weight than their medical restrictions allowed.

94.    The next day, Lopez complained to a PNM supervisor that he and

Kloeppel were being assigned lifting work that exceeded the medical restrictions PNM

had previously agreed to accommodate.

95.     On March 5, 2018, when Kloeppel and Lopez reported for work, the PNM

supervisor over their light duty assignment crew told each of them PNM could no

longer accommodate their medical conditions. The supervisor told them to leave the

premises and not come back until their doctors said they could do the full duties of a

Journeyman Lineman.

96.     On May 11, 2018, Kloeppel received a letter from PNM human resource

personnel advising that if he was not able to return to work by June 3, 2018, he would

involuntarily be placed on unpaid leave status.

97.     HR further instructed Kloeppel he would be officially discharged if he did

not find another job at PNM within 120 days from the date of his work release, and that

his former job would no longer be guaranteed once he went on unpaid leave or long-

term disability leave.

98.     Prior to June 3, 2018, Kloeppel received a medical release to return to

work with only the restriction of no pole climbing.

99.     Kloeppel contacted PNM to ask about returning to work with only the pole

climbing restriction.

100.    PNM denied Kloeppel's request for accommodation stating that he

needed to be fully able to perform all of the duties of a Journeyman Lineman.

101.    Kloeppel then asked PNM about other available positions and was told

he would have to look on his own for open positions, then apply and compete for any

position he felt qualified to perform.

102.    PNM did not provide Kloeppel with a list of open positions that met his qualifications and never had further discussions with him concerning possible reassignment.

103.    While Kloeppel was in unpaid leave status, besides lost pay and overtime, he also lost contributions towards his 401k and contributions of both time and money towards his retirement pension, as well as lost accrual of any paid leave time.

104.    While on unpaid leave status, Kloeppel received a letter from PNM advising that his 120-day unpaid leave was expiring, and if he did not return to work before his leave expired, he would be terminated from his employment.

105.    Between May 2018 and August 2019, no PNM supervisor, manager, or human resource official ever engaged with Kloeppel in an interactive process to discuss potential accommodations, including reassignment, that would have enabled Kloeppel to return to work.

106.    Between May 2018 and August 2019, PNM never discussed any possible accommodations with Kloeppel, including but not limited to, job modifications or reassignment.

**Charging Party Daniel Lopez**

107.    Daniel Lopez was a Journeyman Lineman with PNM.

108.    In January 2018, Lopez tore several muscles in his left shoulder at work which impacted his musculoskeletal system and substantially limited major life activities including lifting and musculoskeletal function.

109.    At all relevant times to this lawsuit, Lopez was a qualified individual with a disability as defined by the ADA.

110.    Lopez was treated by a physician for the shoulder injury and was given a return-to-work release with several restrictions: no pulling, pushing, heavy lifting over 10 pounds, and no pole climbing.

111.    After his doctor's visit, Lopez returned to work and gave his medical restrictions to the supervisor.

112.    Lopez was then reassigned by his PNM supervisor to a vacant light duty position reserved for employees who incurred work-related injuries, working with Kloeppel performing the duties of Line Patrol and Inspector.

113.    Although Lopez's and Kloeppel's new reassigned job positions were supposed to be restricted to light duty assignments within their medical restrictions, their supervisor placed them on the PNM crew performing heavy duty work.

114.    Lopez subsequently re-injured his shoulder in his newly reassigned job position because the supervisors of the PNM crew were having him perform work exceeding the lifting and pulling restrictions set by his doctor.

115.    On March 4, 2018, Lopez met with his PNM supervisor, Art Anaya, and complained that he and Kloeppel were being given tasks that exceeded their medical restrictions in their new reassigned job positions.

116.    Supervisor Anaya then instructed Lopez to go get checked by his doctor, have the doctor review the job description, and bring back another medical release indicating what work he could perform in his new light duty reassignment.

117.    Lopez provided Supervisor Anaya the new medical release with substantially the same medical restrictions he had been working with since January 2018.

118.    When Lopez reported to work on March 5, 2018, Supervisor Anaya told Lopez that effective immediately his light duty reassignment was withdrawn, without any explanation.

119.    Supervisor Anaya then told Lopez in the meeting on March 5, 2018 that he could not come back to work until he had a full release, i.e., a 100% release showing he could perform all of the duties of a Journeyman Lineman without any restrictions.

120.    During the meeting on March 5, 2018, when Lopez informed Anaya that his medical restrictions were no different than when he was performing the light duty position to which he had been assigned, Anaya told Lopez he could not work at all if he had any physical restrictions.

121.    As Supervisor Anaya told Lopez he could not return to work until he was 100% healed and had no medical restrictions, Lopez remained on involuntary leave for 58 days.

122.    PNM allowed Lopez to return to work only after he was released by his doctor to work full duty, without restrictions.

123.    After PNM placed Lopez on involuntarily leave medical status, no supervisor, manager, or human resources official ever engaged with Lopez in an interactive process to discuss potential accommodations that would have enabled

Lopez to return to work, instead of being in unpaid leave status, including job modifications or reassignment.

## FIRST CLAIM FOR RELIEF
### (Failure to Accommodate Disabilities - 42 U.S.C. §§ 12112(a) and (b)(5)(A))

124.   The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

125.   Since at least 2014, PNM maintained a Full Duty Practice of not allowing employees to return to work after medical leave unless they were released to work "full-duty," meaning without medical restrictions, thereby denying reasonable accommodation to employees with disabilities who were able to perform the essential functions of their jobs, with or without reasonable accommodations.

126.   Since at least 2014, PNM maintained its Inflexible Leave Policy that, without exception or extension, forces employees into unpaid leave status on their 91st day of medical leave, causing loss of rights to return to the same job. The decision to place the employee in unpaid leave status and lose the right to return to their own job is made without regard for whether some extension of the 90-day leave or exception to the policy should be provided as a reasonable accommodation for the person's disability.

127.   Since at least 2014, PNM maintained a No Reassignment Policy, which denied reassignment as an accommodation for disability. PNM failed to comply with ADA's mandate to affirmatively seek the accommodation of reassignment accommodations for its qualified employees with disabilities by treating them equally to

non-employee applicants and other employees without disabilities.

128.   By discharging employees who were unsuccessful in obtaining a transfer within the 120-day period allowed pursuant to PNM's No Reassignment policy was a systemic failure to accommodate employees with disabilities.

129.   Davis, Charley, Kloeppel, Lopez and other aggrieved individuals are qualified individuals with a disability under the ADA.

130.   Davis, Charley, Kloeppel, Lopez and other aggrieved individuals were able, with or without reasonable accommodation, to perform the essential functions of their positions at PNM; some of the reasonable accommodations requested by them being additional leave, modifications to current job duties and reassignment to open positions.

131.   PNM failed to engage in an interactive process with Davis, Charley, Kloeppel, Lopez and other aggrieved individuals, to determine appropriate accommodations for their disabilities.

132.   PNM failed and refused to provide Davis, Charley, Kloeppel, Lopez and other aggrieved individuals reasonable accommodations, as required under Section 102(b)(5)(A) of the ADA. 42 U.S.C. § 12112(b)(5)(A).

133.   The effect of the practices complained of in the foregoing paragraphs has been to deprive Davis, Charley, Kloeppel, Lopez and other aggrieved individuals, of equal employment opportunities and otherwise adversely affect their status as employees, because of their disabilities.

134.    PNM's failure to provide reasonable accommodations for Davis, Charley, Kloeppel, Lopez and other employees with disabilities, was done with malice and/or reckless indifference to their federally protected rights under the ADA.

135.    PNM's failure to provide reasonable accommodations for Davis, Charley, Kloeppel, Lopez and other aggrieved employees with disabilities, caused harm such that each is entitled to damages pursuant to 42 U.S.C. § 1981(a).

**SECOND CLAIM FOR RELIEF**
**(Disparate Treatment Based on Disability or the Need to Provide Accommodation 42 U.S.C. §§ 12112(a) and (b)(5)(B))**

136.    The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

137.    Davis, Charley, Kloeppel, Lopez and other aggrieved individuals are qualified individuals with a disability under the ADA.

138.    PNM discharged and/or constructively discharged Davis, Charley and other aggrieved individuals, because of their disabilities, and/or because of the need to provide reasonable accommodation for their disabilities, in violation of Sections 102(a) and 102(b)(5)(B) of the ADA. 42 U.S.C. §§ 12112(a) and (b)(5) (A) and (B).

139.    PNM discriminated against Davis, Charley, Kloeppel, Lopez and other aggrieved individuals, by taking adverse employment actions because of their disabilities, and/or because of the need to provide reasonable accommodation for their disabilities, in violation of Sections 102(a) and 102(b)(5)(B) of the ADA.  42 U.S.C. §§ 12112(a) and (b)(5)(B).

140.    PNM's disparate treatment of Davis, Charley, Kloeppel, Lopez and other

aggrieved employees with disabilities, pursuant to its Full Duty Practice, Inflexible

Leave Policy and No Reassignment Policy, adversely affecting them by involuntarily

placing them into unpaid leave status and/or discharging their employment.

141.    PNM's discriminatory treatment of Davis, Charley, Kloeppel, Lopez and

other aggrieved individuals was done with malice or reckless indifference to their

federally protected rights.

142.    The effect of PNM's policies and practices complained of in the foregoing

paragraphs has been to deprive Davis, Charley, Kloeppel, Lopez and other aggrieved

individuals with disabilities of equal employment opportunities and otherwise adversely

affect her status as an employee, because of her disability, in violation of Sections

102(a) and 102(b)(5)(B) of the ADA, 42 U.S.C. §§ 12112(a) and (b)(5)(B).

143.    PNM's unlawful employment practices complained of in the foregoing

paragraphs caused harm to Davis, Charley, Kloeppel, Lopez and other employees with

disabilities, because of their disabilities and/or the need to accommodate their

disabilities, such that they are entitled to damages pursuant to 42 U.S.C. § 1981(a).

### THIRD CLAIM FOR RELIEF
### (Retaliation - 42 U.S.C. §§ 12203)

144.    EEOC reasserts and incorporates by reference all of the foregoing

allegations.

145.    Davis, Charley, Kloeppel, Lopez and other aggrieved individuals are

qualified individuals with a disability under the ADA.

146.    Since at least 2014, PNM has engaged in unlawful employment practices,

in violation of Section 503 of the ADA, 42 U.S.C. § 12203 by retaliating against Davis,

Charley, Kloeppel, Lopez and other aggrieved individuals.

147.  Davis, Charley, Kloeppel, Lopez and the other aggrieved individuals with disabilities, engaged in protected conduct under the ADA by requesting reasonable accommodations for disabilities or otherwise opposing what they reasonably believed were unlawful discriminatory employment practices based on the ADA.

148.  PNM retaliated against employees who engaged in protected conduct under the ADA by, among other things, discharging and/or constructively discharging them, involuntarily placing them in unpaid leave status, rescinding accommodations without legitimate cause, and/or denying reasonable accommodations, including reassignment.

149.  The effect of the practices complained of in the forgoing paragraphs has been to deprive Davis, Charley, Kloeppel, Lopez and the other aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees, because they engaged in protected activity.

150.  The unlawful employment practices complained of in the forgoing paragraphs were intentional.

151.  The unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to the federally protected rights of Davis, Charley, Kloeppel, Lopez and the other aggrieved disabled individuals.

152.   PNM's unlawful retaliation caused harm to Davis, Charley, Kloeppel, Lopez and other employees with disabilities, because of their disabilities and/or the

need to accommodate their disabilities, such that they are entitled to damages pursuant

to 42 U.S.C. § 1981(a).

## FOURTH CLAIM FOR RELIEF
**(Use of Discriminatory Standards, Criteria, or Methods of Administration
42 U.S.C. §§ 12112(a), (b)(3)(A) and (b)(6))**

153.  The allegations contained in the foregoing paragraphs are hereby

incorporated by reference.

154.  During the relevant time period, PNM utilized and/or maintained a Full

Duty Practice that, when applied, prevented employees with disabilities from returning

to work from medical leave because they had medical restrictions.

155.  Under PNM's Full Duty Practice, employees with disabilities were told that

in order to return to work they must be "100% healed", have "no physical restrictions",

or provide a doctor's release to work "full duty" without medical restrictions.

156.   Due to instructions from PNM supervisors, many of its employees did not

seek to return to work if they had medical restrictions.

157.  Many of the PNM employees are informed by their PNM supervisors that

they will not be allowed to return to work except with a full-duty release and/or a

release with no restrictions.

158.  PNM employees seeking to return to work with medical restrictions were

often denied the ability to return to work by PNM supervisors and human resource

personnel.

159.  When on occasion PNM agreed to accommodate an employee's medical

restrictions, PNM supervisors arbitrarily withdrew the accommodation and imposed a

"the full-duty" requirement; meaning, the supervisor refused to allow the employee to return to work until they provided a release to work without medical restrictions.

160.  PNM's Full Duty Practice is a standard, criteria, or method of administration that has the effect of discrimination on the basis of disability, in violation of Sections 102(a) and 102(b)(3)(A) of the ADA.  42 U.S.C. §§ 12112(a) and 12112(b)(3)(A).

161.  PNM's Full Duty Practice is a qualification standard, employment test, or other selection criteria that screens out or tends to screen out individuals with disabilities, in violation of Sections 102(a) and 102(b)(6) of the ADA, 42 U.S.C. §§ 12112(a) and 12112(b)(6).

162.   PNM's discriminatory standards, criteria, methods of administration, qualification standards, employment tests, and/or other selection criteria had a discriminatory impact on the federally protected rights of Davis, Charley, Kloeppel, Lopez and other aggrieved individuals with disabilities.

**JURY TRIAL DEMAND**

163.   The Commission requests a jury trial on all questions of fact raised by its complaint.

**<u>PRAYER FOR RELIEF</u>**

Wherefore, the Commission respectfully requests that this Court:

A.    Grant a permanent injunction enjoining Public Service Company of New Mexico and PNMR Services Co., their officers, successors, assigns, and all persons in active concert or participation with them, from

discriminating against employees because of a disability and/or need for reasonable accommodation.

B.  Grant a permanent injunction enjoining Public Service Company of New Mexico and PNMR Services Co., its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it, from retaliating against qualified individuals with disabilities because of their protected activity under the ADA, including but not limited to the employees' requests for and/or need for reasonable accommodation.

C.  Order Public Service Company of New Mexico and PNMR Services Co., to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities, and which eradicate the effects of its past and present unlawful employment practices.

D.  Order Public Service Company of New Mexico and PNMR Services Co., to cease utilizing the Full Duty Practice, the Inflexible Leave Policy as administered, and the policy or practice of not considering reassignment as an accommodation for disability, and to revise their policies and procedures to bring them into compliance with the Americans with Disabilities Act, as amended.

E.  Order Public Service Company of New Mexico and PNMR Services Co. to make whole Davis, Charley, Kloeppel, Lopez and other aggrieved individuals without disabilities for whom the EEOC seeks relief by

providing appropriate backpay and lost benefits with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to the reinstatement of Davis, Charley and other aggrieved individuals, or front pay in lieu thereof.

F.    Order Public Service Company of New Mexico and PNMR Services Co. to make whole Davis, Charley, Kloeppel, Lopez and other aggrieved individuals for whom the EEOC seeks relief, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in the paragraphs above, including but not limited to relocation expenses, job search expenses, and medical expenses, in amounts to be determined at trial.

G.    Order Public Service Company of New Mexico and PNMR Services Co. to make whole Davis, Charley, Kloeppel, Lopez and other aggrieved individuals for whom the EEOC seeks relief by providing compensation for past and future nonpecuniary losses resulting from the unlawful employment practices described in the paragraphs above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, loss of credit standing, and stress, in amounts to be determined at trial.

H.    Order Public Service Company of New Mexico and PNMR Services Co. to pay Davis, Charley, Kloeppel, Lopez and other aggrieved disabled

individuals for whom the EEOC seeks relief, punitive damages for its malicious or reckless conduct described in the paragraphs above, in amounts to be determined at trial.

I.      Grant such further relief as this Court deems necessary and proper.

J.      Order each side to pay its own costs of this action.

K.      Order each side to pay its own attorney fees incurred in this action.

RESPECTFULLY SUBMITTED this <u>27th</u> day of September 2023
.

GWENDOLYN YOUNG REAMS
Acting General Counsel

CHRISTOPHER LAGE
Deputy General Counsel

MARY JO O'NEILL
Regional Attorney

CHRISTINA VIGIL FRAZIER
Assistant Regional Attorney

<u>*/s/ Jeff A. Lee*   </u>
Jeff A. Lee
Senior Trial Attorney
Lucia Moran
Trial Attorney
Equal Employment Opportunity
Commission
Albuquerque Area Office
500 Gold Ave NW, Suite 6401
Albuquerque, New Mexico 87103
(505) 738-6723
jeff.lee@eeoc.gov

Attorneys for Plaintiff EEOC

**PLEASE NOTE: For purposes of service upon the EEOC, it is sufficient that pleadings, notices, and court documents be served upon the Trial Attorneys.  Duplicate service is not required on the General Counsel and Associate General Counsel in Washington, D.C.**